Sally DOE, by her Next Friend Mother DOE 1, Jane Doe, by her Next Friend, Mother Doe 2, and Mary Doe, by her Next Friend Mother Doe 3, Plaintiffs,

v.

WARREN CONSOLIDATED SCHOOLS, a Michigan municipal corporation, James Kearly, Dr. James Clor, Dr. Paul Stamatakis, and Jerry Maiorano, Defendants.

No. 00–CV–72956–DT.

United States District Court, E.D. Michigan, Southern Division.

Feb. 13, 2003.

William R. Seikaly, Seikaly & Stewart, Bloomfield Hills, MI, for Plaintiff.

Stephen J. Hitchcock, Timothy J. Mullins, Troy, MI, Gary J. Collins, Collins, Blaha, Southfield, MI, Suzanne P. Bartos, Plunkett & Cooney (Detroit), Detroit, MI, for Defendant.

## *ORDER*

BORMAN, District Judge.

**COUNT I: GRANTING DEFENDANTS WARREN CONSOLIDATED SCHOOLS, DR. JAMES CLOR, DR. PAUL STAMATAKIS AND JERRY MAIORANO'S MOTION FOR SUMMARY JUDGMENT AS TO COUNT I—GROSS NEGLIGENCE/INTENTIONAL MISCONDUCT; COUNT II: DENYING DEFENDANTS WARREN CONSOLIDATED SCHOOLS, DR. JAMES CLOR, DR. PAUL STAMATAKIS AND JERRY MAIORANO'S MOTION FOR SUMMARY JUDGMENT AS TO COUNT II—42 U.S.C. § 1983; COUNT III:(1) GRANTING DEFENDANTS DR. JAMES CLOR, DR. PAUL STAMATAKIS AND JERRY MAIORANO'S MOTION FOR SUMMARY JUDGMENT AS TO COUNT III—TITLE IX; AND (2) DENYING DEFENDANT WARREN CONSOLIDATED SCHOOLS' MOTION FOR SUMMARY JUDGMENT AS TO COUNT III—TITLE IX**

Now before the Court is (1) Defendants Warren Consolidated Schools, Dr. James Clor and Jerry Maiorano's motion for sum-

mary judgment and (2) Defendant Dr. Paul Stamatakis' motion for summary judgment. Plaintiffs' complaint sets forth three counts: Count I: gross negligence and intentional misconduct; Count II: 42 U.S.C. § 1983—violation of the due process clause of the Fourteenth Amendment; and Count III: Title IX sexual harassment. Plaintiffs' complaint alleges that they suffered injuries as a result of being sexually molested by an elementary school teacher, Defendant James Kearly, while they were students at Siersma Elementary School in Warren, Michigan.

The Court heard oral argument on January 31, 2003. Having considered the entire record, and for the reasons that follow, the Court GRANTS IN PART and DENIES IN PART the motions for summary judgment. Specifically, the Court

(1) GRANTS the Defendants' motions for summary judgment as to Count I;

(2) DENIES the Defendants' motions for summary judgment as to Count II;

(3) GRANTS Defendants Stamatakis, Clor and Maiorano's motion for summary judgment as to Count III; and

(4) DENIES Defendant Warren Consolidated Schools' motion for summary judgment as to Count III.

## FACTS

Plaintiffs, three young girls,[1] were sexually molested by Defendant James Kearly in 1998 while students at Siersma Elementary School in Warren, Michigan.[2] Defen-

dant Kearly has pled nolo contendere to charges of Fourth Degree Criminal Sexual Conduct related to the instant case, and is currently listed on the state of Michigan's Public Sex Offender Registry—see www.mipsor.state.mi.us. Defendant Kearly is not a party to the motions for summary judgment currently before the Court.

Plaintiffs' complaint, filed on June 30, 2000, sets forth three counts—Count I: Michigan gross negligence and intentional misconduct; Count II: Federal 42 U.S.C. § 1983—violation of the due process clause of the Fourteenth Amendment; and Count III: Federal Title IX sexual harassment. In addition to Defendant Kearly, Plaintiffs seek relief from the Warren Consolidated School District ("District"), Dr. Paul Stamatakis ("Stamatakis"), former Superintendent of the Warren Consolidated Schools, Dr. James Clor ("Clor"), current Superintendent of the Warren Consolidated Schools and former Associate Superintendent in charge of elementary education, and Jerry Maiorano ("Maiorano"), Principal at Siersma Elementary School.[3] The Court must determine whether genuine issues of material fact exist with respect to whether the Warren Consolidated School District and Defendants Stamatakis, Clor and Maiorano are liable under the legal theories set forth in Plaintiffs' complaint.

Defendant Kearly began employment with the Warren Consolidated School District in 1966 as a physical education teacher at Pennow Elementary School.[4]

1. In order to protect their privacy, Plaintiffs have been identified as Sally Doe, Jane Doe, and Mary Doe.

2. None of the Defendants currently before the Court contest the Plaintiffs' allegations of sexual molestation by Defendant Kearly.

3. Unless otherwise noted, the use of the term "Defendants" will refer to all named Defendants except Defendant Kearly.

4. Kearly's application with the District stated that he had been arrested for a "traffic viola-

tion" in 1959; in reality, Kearly had been convicted of negligent homicide. This inaccuracy was not discovered or apparently even investigated by the District. In fact, the District ignored Sharon Hughes' request that an investigation be conducted into Kearly's background. (Hughes Dep. at 254.) The District did, however, receive two positive evaluations from Kearly's former employer, Anchor Bay High School. (District's Br. Exh. A, documents 1587, 1858–61.)

Kearly's official personnel file contains no reported incidents of misconduct until 1984. In 1984, numerous allegations of improper conduct, both sexual and non-sexual, began to surface against Kearly. These include, but are not limited to, the following:

In 1984, a complaint was lodged against Kearly by a male student alleging that Kearly grabbed him by the neck and slammed him into a locker. The allegation was confirmed, in part, by one of Kearly's gym aides; Kearly received a verbal reprimand. (District's Br. Exh. A, document 548.)

In 1985, Kearly was transferred to Flynn Middle School ("Flynn"). Allegations of improper sexual misconduct began surfacing almost immediately. On October 8, 1985, a female student alleged that Kearly looked down the front of her (as well as another female student's) top during class. No action was taken against Kearly. The assistant principal discounted the student's allegation, notwithstanding that more than one student made such an observation, because the student's accusation came after being disciplined by Kearly. (District's Br. Exh. A, document 494.)

On November 3, 1986, Flynn Principal Moy and Assistant Principal Weinberg met with Kearly to discuss numerous allegations/rumors of improper conduct, including, but not limited to: (1) having girls around his desk; (2) looking down female students' dresses; (3) keeping girls after class; and (4) teasing students and making improper comments such as "because you were over last night." (District's Br. Exh, A, document 440.) Kearly allegedly received another verbal warning. (District's Br. at 1.)

In 1986 or 1987, Kearly began sexually harassing a nineteen year-old former student, Tracy Stack, who was employed by the District as an assistant volleyball coach at Warren High—Kearly was the varsity volleyball coach. Kearly made inappropriate sexual comments to Ms. Stack, kissed her while conducting "meetings" at local bars, bought her alcoholic beverages, called her at home, and told her he could provide her with a furnished apartment. (Pl.'s Resp. Br. Exh. 3, documents 597–99, 611; Pl.'s Resp. Br. Exh. 14.) A deal was brokered by the District in which Ms. Stack, in order to keep her job, agreed not to file formal sexual harassment charges.[5] (Id.) Plaintiff received a "strong" reprimand for exercising "extremely poor judgment," from Lawrence Beckett, Associate Superintendent for Personnel/Employee Relations. The reprimand noted that "[t]his poor judgment on your part could have led to a formal sexual harassment charge against you and the school district." [6] (District's Br. Exh. A, document 522.)

In January, 1988, Flynn Principal Moy discussed several issues with Kearly, including an incident in which a female student slapped him after he touched her buttocks. Moy noted that students were "talking" and that he could lose it all. Apparently, no discipline was taken

---

5. In fact, Stack's affidavit indicates that Associate Superintendent Beckett told her that if she wanted to keep her job, she would not pursue the matter any further. (Stack Affidavit ¶ 36.)

6. On May 7, 1990, Merle Loch, Warren High Principal, drafted a letter to Kearly stating that the school would not renew Kearly's contract as the school's volleyball head coach.

The letter documented, in detail, nine reasons for the decision. (Pl.'s Resp. Br. Exh. 3, document 1666.) Yet, two weeks later, on May 22, 1990, Mr. Loch drafted a glowing "to whom it may concern" letter of recommendation for Kearly, noting that Kearly was one of the "finest and most knowledgeable volleyball coaches in the Detroit Metropolitan area." (Id. document 1665.)

against Kearly. (District's Br. Exh. A, document 446.)

On October 5, 1989, Flynn Assistant Principal Chuck Kluka met with Kearly to discuss a parent's concern that her daughter would be placed in Kearly's class. Specifically, the parent heard rumors that Kearly "puts girls with large boobs in [the] front row" and "drops pen[s] to look up dress[es]." It is unclear what, if anything, transpired as a result of this concern.[7]

In January 1990, a crisis team met with a Flynn student, LW,[8] after she wrote a letter signed "your death wish friend." In October, 1990, Principal Moy and others met after LW exhibited renewed depression. It was at this time that Principal Moy learned that LW's depressed state resulted, in part, from Defendant Kearly's teasing and inappropriate touching (touching LW on the buttocks). (District's Br. Exh. A, documents 495, 2085.) Several students were interviewed by school officials in response to this allegation. In addition to confirming LW's allegations of mistreatment, teasing and inappropriate contact (including touching her buttocks), (District's Br. Exh. A, documents, 418, 420–25), the eleven students also gave consistent accounts of highly inappropriate behavior by Defendant Kearly. This included conduct such as (1) picking girls as class favorites and asking them to sit by him during movies; (2) touching, hugging and tickling girls, including touching or pretending to touch their buttocks; (3) teasing students; (4) stating "smile if you love me"; and (5) pretending to spit on students. (District's Br. Exh. A, documents 416–27.)

Despite these assertions, Principal Moy, on November 5, 1990, sent a letter to Kearly, stating that Kearly would not be reprimanded for this misconduct. Instead, Moy issued a "letter of direct order," directing Kearly to refrain from physical contact with students, to refrain from teasing and other negative comments, and to refrain from showing favoritism. (District's Br. Exh. A, document 1599.) On December 17, 1990, the school made a report of abuse to the Michigan Department of Social Services regarding the LW matter. Defendant Kearly was not mentioned in this report. Instead, the District listed LW's mother as the alleged perpetrator of the abuse. (District's Br. Exh. A, document 497.)

The Sterling Heights Police Department commenced a criminal investigation into LW's accusations against Kearly, and criminal assault & battery charges were brought against him. (District's Br. Exh. A, documents 463, 520.) The District suspended Kearly with pay on May 1, 1991, stating that "[i]t would 'appear' that the prosecutor's office has information that we do not have." (District's Br. Exh. A, document 502.) On December 10, 1991, Kearly was acquitted of the assault and battery charges. According to Thomas Dettloff, lead police investigator on the Kearly case, the Warren Consolidated School District was only "minimally cooperative" in the investigation. (Dettloff Affidavit ¶ 8.) Specifically, the District allegedly failed to produce numerous documents, including the names and/or interview notes of the students interviewed as part of the District's internal investigation into LW's accusations. (*Id.*) Dettloff indicated that the information would have substantially strengthened the case against Kearly. (*Id.* ¶ 9.)

---

7. Concerns were raised in May, 1989 that Kearly was urinating in a sink in the teacher's lounge. (District's Br. Exh. A, document 455.)

8. LW's name is not being used to protect her identity.

On December 13, 1991, after Kearly was acquitted, Mr. Beckett, Associate Superintendent of Personnel/Employee Relations wrote a letter to Kearly expressing "relief" at the verdict. The letter indicated that Kearly would be permitted to return to work on January 6, 1992, and that all reference to the suspension would be expunged from his personnel file. In addition, the District agreed that Kearly's 95-day suspension would now be referenced in his personnel file as a 95-day "conference leave of absence." (District's Br. Exh. A, document 1304.)

On September 9, 1993, school officials were again notified of improper conduct by Kearly. This time, a female student's mother notified the school that her daughter was pretending to be sick because she did not want to return to Kearly's classroom. Once again, the cause of the incident was improper touching by Kearly. (District's Br. Exh. A, document 505.) On September 28, 1993, Kearly received a written reprimand from Assistant Superintendent Beckett. (District's Br. Exh. A, document 1325.) The letter stated, in relevant part:

I have had ample time to review these facts and to review your history and I am convinced that this reprimand is in order. I am convinced that in spite of Mr. Moy's alerts to you, the written student statements which I shared with you in 1990, your training as a teacher for effective classroom management, and the fact that it is common knowledge that middle school females need certain "spacing" from males, *you have been unable* to maintain a proper student-teacher decorum and distance. I direct you to consider why this is and to seek counseling through the Employee Assistant Center or some other acceptable alternative.

This is important! Any further inappropriate behaviors on your part, especially with female students, will result with more severe disciplinary action up to and including recommendation for the filing of tenure charges.

(*Id.*) (emphasis in original).

The District did not follow through on this threat. After Kearly grieved the reprimand though his union, Assistant Superintendent Beckett, just as he had with respect to LW, expunged the reprimand from Kearly's personnel file even though he believed the reprimand was, in fact, issued for just cause. Beckett did so because the student was now comfortable in Kearly's class and the student's mother "express[ed] satisfaction with the way things are going now." (District's Br. Exh. A, document 627.)

In 1994, Kearly was transferred to Beer Middle School. On May 19, 1995, Kearly submitted a transfer request, seeking to fill a job posting for a elementary school physical education position. Kearly's reason for seeking the transfer was to return "back to [my] original position." (District's Br. Exh. A, document 197.) It was the ultimate approval of this transfer that put Kearly in a physical position to sexually assault the three plaintiffs in this case.

Kearly, however, did not immediately receive approval for the transfer. Article XI of the collective bargaining agreement entered into between the District and the Warren Education Association ("WEA") provided: "In the event a receiving building principal does not wish to accept an applicant for transfer, s/he will provide the reasons in writing, if requested to do so." (Pl.'s Resp. Br. Exh. 11.) Because the elementary position involved work at multiple schools (multiple principals),[9] Mike Michalowski, District Director of Health, Physical Education and Athletics, wrote to

---

9. *See* Roger Allen Dep. at 122.

Sharon Hughes, Director of Personnel, opposing Kearly's transfer request, invoking Article XI of the CBA.[10] (District's Br. Exh. A, document 623.) As such, the transfer was initially denied by the District on June 15, 1995.

On June 22, 1995, the WEA filed a grievance on behalf of Defendant Kearly. The WEA argued that Kearly should have been awarded the elementary physical education instructor position because he was the bidder with the most seniority. (District's Br. Exh. A, document 1226.)

On July 20, 1995, Sharon Hughes sent a memorandum to Defendant Superintendent Stamatakis, "strongly urg[ing]" him to uphold the denial of the transfer. Ms. Hughes included items from Kearly's file and noted: "We have a responsibility to the welfare of our students as well as district liability." The letter concluded:

Mr. Kearly's incidents are severe enough and recent enough to warrant concern. I strongly urge that you support administration's decision to deny his transfer to elementary physical education.

(District's Br. Exh. A, document 516.)

Stamatakis, however, overruled the administration's decision to deny Kearly's transfer request. (District's Br. Exh. A, document 633.) In making this decision, Stamatakis "did an end around" the normal chain of command, ignoring Roger

Allen, the Associate Superintendent of Human Resources, who would have vehemently argued against the transfer. (Allen Dep. at 124–28.) According to Stamatakis, he made this decision because he did not feel the information contained in Kearly's personnel file supported tenure charges. The District had removed the allegations with respect to LW, as well as many of the other allegations of improper touching and other conduct described above. (Stamatakis Dep. at 73, 115–16, 147–48, 150, 157, 161–63, 166.) According to Stamatakis, he made the best decision based upon the information available in Kearly's official personnel file—the information in his personnel file allegedly did not provide enough evidence to initiate tenure charges.[11] (Stamatakis Dep. at 47–49, 68, 72, 95.) Thus, Stamatakis concluded that because he could not successfully terminate Kearly's employment with the District, he was obligated to overrule the decision denying Kearly's transfer request.[12]

Stamatakis claims that if all of the information regarding Kearly's prior conduct had been maintained in Kearly's official personnel file, he may have made a different decision regarding the transfer. (Stamatakis Dep. at 158–60.) Mr. Stamatakis also acknowledges that as a general rule, if there is a concern that a teacher could be harming students, it is imperative that the district err on the side of caution and

10. Michalowski wrote that "I do not wish to accept James A. Kearly's transfer bid for an elementary physical education position for the 1995–1996 school year." (District's Br. Exh. A, document 623.)

11. In his affidavit, Stamatakis characterizes the information available to him as "vague and old." (Stamatakis Affidavit ¶ 6.)

12. In fact, on October 5, 1995, Stamatakis formally reprimanded Ms. Hughes, in part, for failing to expunge material from personnel files, including Mr. Kearly's and for mak-

ing recommendations "without making diligent review of the applicable personnel file ... and by considering matters which by agreement were to have been destroyed or expunged from the employees personnel file." (Pl.'s Resp. Br. Exh. 3, document 1277; Hughes Dep. at 104—noting that she had been reprimanded for her handling of the Kearly case.) Apparently, the District and the WEA entered into at least two Letters of Understanding which required the removal of certain material from Kearly's personnel file. (Pl.'s Resp. Br. Exh. 3, document 1094–99; Stamatakis Dep. at 44.)

**868**

protect the students, even if it means breaking a contract. (Stamatakis Dep. at 58.) Finally, although Stamatakis admits that younger students are more vulnerable to teachers, like Kearly, who may be sexual predators, Stamatakis felt that a transfer might be appropriate because he would be taken out of a setting in which there were older, more developed girls that Kearly might be attracted to. (Stamatakis Dep. at 93–95.)

Stamatakis' (as well as Clor's, see *infra*) claim of ignorance is in direct conflict with the deposition testimony of Marsha Pando, Associate Superintendent of Human Resources.[13] According to Ms. Pando, meetings were conducted by Dr. Stamatakis prior to his approval of Kearly's transfer request—Dr. Clor and Mr. Michalowski attended these meetings. (Pando Dep. at 75–76, 114.) Sharon Hughes, Director of Personnel, presented material concerning allegations made against Kearly that were no longer contained in Kearly's personnel file, and voiced her concern at the meetings that Kearly should not be placed with elementary school students who would be unable to protect themselves from a sexual predator.[14] (Pando Dep. at 77–78, 84.) Stamatakis, presented with this information, allegedly called Kearly a "scumbag."[15] (Hughes Dep. at 247–48.) Fur-

---

**13.** Ms. Pando began as the District's Associate Superintendent of Curriculum and Instruction. She became Associate Superintendent of Human Resources in March of 1995 or 1996. (Pando Dep. at 26–27.)

**14.** Specifically, the following colloquy took place at Ms. Pando's deposition:

Question: Did you have the material from Sharon Hughes in which she indicated that it was her belief that he should not be transferred because of the serious allegations made against him and that he should not—and her concern that elementary school students would not be able to protect themselves from this man?

\* \* \* \* \* \*

Answer: At that time, she didn't express them directly to me. She expressed them to the superintendent, and there was—there was some discussion of the file that she had.

\* \* \* \* \* \*

Part of the discussion was that the documents that were actually brought forward were not part of the personnel file and that, as it related to the criminal charges, that those documents, there had been an agreement by somebody in the district prior to my time that those documents were to be removed and I'm probably confusing a little bit of what I know now from what I knew then.

\* \* \* \* \* \*

There was discussion of, hypothetically, if he were moved to an elementary school, how that would, you know, how that would be handled if he were—and what the circumstances of that would be in the teaching environment.

There was a discussion that a teacher physically, an elementary school teacher, walks their children to the classroom and picks them up, that the class periods are shorter. There was discussion that he was to be evaluated each year. . . .

\* \* \* \* \* \*

Answer: I do recall that he would be evaluated every year, not that there would be a plan of assistance, but he would be evaluated every year. I don't recall a plan of assistance being mentioned. I recall that there would be a directive that he would not be allowed to have any student assistants. . . .

(Pando Dep. at 77–80, 81.)

**15.** The following colloquy took place at Ms. Hughes' deposition:

Question: When you were the director of personnel and Mr. Kearly wanted to transfer to an elementary school, it was your opinion that Mr. Kearly had had a number of incidents in which he demonstrated poor judgment that involved inappropriate contact with students, true or not true?

Answer: True.

Question: That he demonstrated what was, in your mind, a danger to female students in the district?

Answer: True.

Question: That you were concerned that the younger students would be less likely and

ther, during the discussions, Pando had the impression that Dr. Clor was vouching for Kearly.[16] (Pando Dep. at 104.) After Stamatakis make the decision to allow the transfer, (Pando Dep. at 87—"the ultimate decision . . . would have been made by the superintendent"), it was communicated that Kearly would not be allowed to have student aides.[17] (Pando Dep. at 81, 111–12, 113, 132.)

On October 27, 1995, shortly after Kearly's transfer was approved, the District expunged Kearly's personnel file of numerous other references to prior allegations of improper conduct and behavior. This in-

cluded items discussed *supra*, such as Principal Moy's November 5, 1990 letter of direct order, numerous documents and notes related to the Sterling Heights Police Department's criminal investigation of Kearly, Assistant Superintendent Beckett's September 28, 1993 written reprimand of Kearly, the aforementioned letters drafted by Hughes and Michalowski opposing Kearly's transfer, and Ms. Hughes' July 20, 1995 letter to Superintendent Stamatakis. (District's Br. Exh. A, document 594–95.)

Notwithstanding the District's approval of the transfer and subsequent purging of

less able to protect themselves and object to Mr. Kearly's conduct?
Answer: True.
Question: You expressed those views to both administrative and counsel at the meetings which we talked about?
Answer: True.

\* \* \* \* \* \*

Question: Who was in attendance at the meeting?
Answer: Mr. Malkowski, Dr. Stamatakis and Mr. Collins.
Question: Did anyone indicate that the substance of what you had expressed was not true?
Answer: No.
Question: Did they agree with the substance of what you expressed and just disagree with the conclusion you came to?
Answer: They called him a scumbag.
Question: They called him a scumbag?
Answer: Mr. Kearly.

\* \* \* \* \* \*

Question: You said they referred to him as a scumbag. Would you give me the context of that?
Answer: It shocked me. I think Dr. Stamatakis said, we know he's a scumbag.

(Hughes Dep. at 246–48.) Ms. Hughes subsequently stated that it was either Mr. Collins, the District's attorney, or Mr. Stamatakis who referred to Kearly as a scumbag at the meeting. (Hughes Dep. at 249.)

16. Specifically, the following colloquy took place at Ms. Pando's deposition:
Question: And did you get the sense that Jim Clor knew Jim Kearly?

Answer: Yes.
Question: How well?
Answer: I don't know how well.
Question: What gave you the sense that he knew him?
Answer: General discussions.
Question: Like what?
Answer: I don't really recall specifics.
Question: Take whatever you recall. What left you with the impression?
Answer: Specifically, the discussion at the time during the negotiations, you know, that there had been allegations against him but they weren't proven.
Question: That was—did you get the sense that Mr. Clor was essentially vouching for Mr. Kearly?
Answer: I had that impression.
(Pando Dep. at 103–04.)

17. This was a unique directive. Ms. Pando testified:

Question: So it was a unusual directive or unique directive agreed?
Answer: I would assume that it was unique.
Question: It being unique, did you have some understanding of why he was being given the directive?

\* \* \* \* \* \*

Answer: Because he was transferred to the elementary school but there was a stipulation put on that that he would be evaluated annually, he would not be allowed to have student aides, and he was to be put in buildings where he was going to be monitored.
(Pando Dep. at 113.)

Kearly's personnel file, Stamatakis claims that he put Defendant Clor in charge of making sure that Kearly would be closely supervised at the elementary school level.[18] (Stamatakis Dep. at 82–83, 91, 171.) Additionally, as previously discussed, Kearly was directed that he was not to use student assistants. (Stamatakis Dep. at 122.)

According to Defendant Clor (contrary to the testimony of Ms. Pando, *supra*), he was summoned, for unknown reasons, to a meeting with Defendant Stamatakis and others, and informed that he would provide supervision over Kearly. (Clor Dep. at 20, 22.) According to Clor, he was not told that Kearly was prohibited from using students aides; the only condition that Clor claims he was aware of was that Kearly was to be evaluated on an annual basis, forever. (Clor Dep. at 35, 122.) Moreover, because Clor was in charge of elementary educational issues as opposed to personnel issues, (Clor Dep. at 19–20), Clor claims that he knew nothing of Kearly's past misconduct other than a vague understanding that Kearly had been acquitted of an unspecified criminal charge. (Clor Dep. at 23–24.)

After the transfer, Kearly was assigned to work at several elementary schools, including Harwood Elementary School, and Siersma Elementary School where the Plaintiffs in this case were sexually assaulted. Defendant Jerry Maiorano was the principal at Siersma Elementary School, and thus was in charge of the day-to-day oversight of Kearly. (Maiorano Dep. at 11, 83.)

Kearly and Maiorano had been close friends since they began teaching together in Warren, in 1968, at Frost Elementary School. They maintained a social relationship and remained close friends until at least the early 1990's-Maiorano described the relationship as a thirty-year friendship. (Maiorano Dep. at 32–36, 39; Pando Dep. at 139.) Indeed, Maiorano and Kearly were drinking buddies, and Maiorano was the godfather to one of Kearly's children. (Maiorano Dep. at 59–61; Hughes Dep. at 68.)

Despite this very close relationship, Maiorano claims virtual ignorance with respect to Kearly's past instances of improper conduct. Maiorano claims that he was not even aware of the specifies of Kearly's first criminal trial—he was aware of talk, allegations, rumors and innuendo that Kearly was involved in criminal sexual conduct with a student and other improper activity—Maiorano, however, chose not to believe any of the speculation because he and Kearly had been longtime friends. (Maiorano Dep. at 34–40, 99.) Maiorano contends that the District did not inform him of Kearly's documented history of past misconduct. (Maiorano Dep. at 54, 56, 75, 84–85, 93, 96.) Maiorano acknowledges, however, that he was informed during the 1997–1998 school year that Kearly was not allowed to use older students to assist him in working with younger students.[19]

---

18. The following colloquy took place at Stamatakis' deposition:

Question: [Clor] is the person who you relied upon the most for handling the Kearly matter, is that correct?
Answer: With regard to the transfer to the elementary?
Question: Well, that's part of it.
Answer: Yes, he was the key person in that.
Question: Was he also the key person that you relied upon to get information about Kearly?
Answer: Yes.

Question: He was the person who you would have assumed would have best known Kearly's history?
Answer: Yes.
(Stamatakis Dep. at 173–74.)

19. The following colloquy took place at Maiorano's deposition:

Question: In the 1997/'98 school year, you were aware that he not use older students to assist him in working with younger students without specific prior permission from the building principal?
Answer: That's in the evaluation, yes.

(Maiorano Dep. at 80; Pando Dep. at 133–34, 183.) Maiorano was aware that Kearly was under an imposed requirement of an out-of-cycle evaluation. (Maiorano Dep. at 56.) Indeed, Maiorano testified that he was requested to do an out-of-cycle evaluation on Kearly before the instant molestation took place. (*Id.* at 76.)

On January 31, 1996, a new allegation of improper conduct surfaced. A male student at Harwood Elementary School reported that Kearly made fun of him and "grabbed his own crotch" in front of the class. (District's Br. Exh. A, document 1084.) When Mr. Faulman, Harwood Elementary School's Principal, confronted Kearly, he observed four fifth grade girls hugging Kearly; one of them stated "I love you and I want to marry you." (*Id.*)

Kearly was instructed to refrain from touching female students. (*Id.*)

On February 7, 1996, Principal Faulman witnessed fifth grade girls leaving a multipurpose room at the school. When questioned, the girls indicated that they were helping Mr. Kearly. Defendant Clor, who happened to be at the Harwood Elementary School on this date, observed Kearly's interaction with the young girls. (Clor Dep. at 13–14.) In fact, Marsha Pando, Associate Superintendent of Human Resources, claims that Clor indicated that he witnessed Kearly kissing one of the girls on the lips.[20] (Pando Dep. at 127–28, 143.) Clor contends that such an allegation is a "blatant lie," and no mention of Kearly kissing one of the girls appears in Faulman's memorandum regarding the incident.[21] (Clor Dep. at 76; District's Br.

Question: You knew it then?
Answer: Yes.
(Maiorano Dep. at 80.)
Ms. Pando testified that Maiorano was aware of the restrictions:
Question: Okay. Now, did you come to some conclusion during this entire process whether or not Mr. Maiorano knew about the restrictions that Mr. Kearly had had placed on him that he was not to use any student aides?
Answer: Jerry Maiorano was aware that he was not to have aides.
Question: How do you know that?
Answer: Based on conversations with him.

*   *   *   *   *   *

Question: Okay. Did Mr. Maiorano, during your investigation, confirm to you that he, in fact, did know about this restriction.
Answer: He knew he was not supposed to have aides, he did not know that he was using the aides.

*   *   *   *   *   *

Question: And he confirmed that to you?
Answer: Yes.
(Pando Dep. at 133–34.)

**20.** The following colloquy took place at Pando's deposition:
Question: Then it says, he was hugging girls and Jim Clor saw him kiss a girl on the lips?

Answer: Yes.

*   *   *   *   *   *

Answer: And, it was suggested to ask him if he had ever kissed a student and I was told at that time that Jim had seen him kiss a girl on the lips.
Question: And I assume that you confirmed that with Mr. Clor somewhere along the line before the interview?
Answer: Yes I did.
Question: Okay. Mr. Clor confirmed it to you?
Answer: Yes, he did.
(Pando Dep. at 127–28.)

**21.** Faulman's incident report was copied to Dr. Clor, supporting Stamatakis' claim that Clor was in charge of closely supervising Kearly. (District's Br. Exh. A, document 1083.) *According to Dr. Stamatakis' deposition:*
Question: Dr. Clor [was] to investigate this matter in that '96 time period.
Answer: Yes.
Question: Did he provide you with the results of his investigation?
Answer: Yes.
Question: Did he put it in writing?
Answer: No.
Question: Why not?
Answer: I don't know.
Question: Do you recall what he told you?

Exh. A, document 1083.) Faulman does, however, document Kearly's use of five fifth grade student assistants in his kindergarten classes. (*Id.*)

On February 20, 1996, Personnel Director Hughes wrote, once again, to Superintendent Stamatakis expressing "grave concern" over Kearly's contact with young girls. Her letter states:

This is to clarify my comments made regarding Mr. Kearly, Elementary Physical Education teacher at Harwood, as reported to me by the principal, Mr. Faulman.

During my meeting with you on Thursday, February 8, 1996 in your office, I stated that due to statements I had heard from district staff, I called Mr. Faulman on the morning of February 8, 1996 and asked how Mr. Kearly was doing.

Mr. Faulman reported that he had had complaints from three boys regarding unfair treatment and that the girls were receiving special treatment not afforded to the boys. At the end of January, he had a complaint from the father of a fourth grade boy. In this particular instance, his son wanted to go to the bathroom. Mr. Kearly denied permission and grabbed his own crotch in front of the students to demonstrate that the boy could hold it.

While Mr. Faulman was in the hall with Mr. Kearly, four fifth grade girls approached Mr. Kearly and hugged him. One of them reportedly said to Mr. Kearly, "I love you. I want to marry you." Mr. Faulman directed Mr. Kearly to cease and desist, not to talk to girls and that he must tell the girls to stop this behavior.

It came to Mr. Faulman's attention that Mr. Kearly had been getting five fifth grade girls released from their classroom for a month to "help him with the Kindergarten children." Mr. Faulman directed Mr. Kearly, "You will not use fifth grade girls for anything."

According to Mr. Faulman, three more parents were coming in to complain on February 9, the day following my phone call. He indicated that one memo had been sent to Dr. Clor and another would probably follow.

It is again with *grave concern that I have approached you on this matter of Mr. Kearly and elementary girls. The safety and welfare of our students is our most important charge.* Since I have not heard from you, this is to clarify that it is my expectation that you will either conduct or direct whatever investigation or procedures you believe to be appropriate in this matter.

(District's Br. Exh. A, document 515) (emphasis added). On February 28, 1996, Defendant Stamatakis responded by (1) notifying Ms. Hughes that Clor was directed to investigate the matter; and (2) chastis-

Answer: Basically, that he investigated and everything is under control, so to speak, that he's on top of, on top of the case.

❖    *    *    *    *    *

Question: Okay. If he says he saw female students walking up and hugging Mr. Kearly and told Mr. Kearly, don't let that happen again, would you believe that or would that be an allegation?

Answer: I would believe him.

Question: Okay. Go ahead. Did Dr. Clor ever respond to you and tell you what the conclusion of his investigation was?

Answer: That Kearly was, I guess the term is, reprimanded or told that that type of behavior is not to be, that it's not condoned; that he is to maintain proper decorum with students and that kind of a response. I did not get it in writing so I can't tell you verbatim what he said but my understanding was that he had investigated and he had dealt with the situation.

(Stamatakis Dep. at 82–83, 84.)

ing Ms. Hughes for not first expressing her concern to Roger Allen. (District's Br. Exh. A, document 1060.)

In September, 1998, one of the Plaintiffs in this case reported to her mother that Kearly had inappropriately touched her and two other girls while they where aides in Kearly's gym class. Kearly was removed from the classroom and tenure charges were initiated.[22] (District's Br. at 6.) Kearly, when initially confronted with the charges, claimed that Defendant Maiorano gave him permission to use student aides. (Pl.'s Resp. Br. Exh. 2, document 31–32; Callaghan Dep. at 20.) Moreover, after Maiorano was provided with the specific details of the sexual abuse, Kearly was asked to remove his personal belongings from the building. On his way out, Kearly told Maiorano: "Love you, brother." (Maiorano Dep. at 117.) Maiorano acknowledges that Kearly was hoping that he would cover for him. (*Id.*) Maiorano responded: "Don't worry about it, it's okay." (*Id.*) Maiorano claims that he was just trying to avoid Kearly.[23] (*Id.*)

As previously noted, Plaintiffs' complaint, filed on June 30, 2000, sets forth three counts—Count I: Michigan gross negligence and intentional misconduct; Count II: Federal 42 U.S.C. § 1983—violation of the due process clause of the Fourteenth Amendment; and Count III: Federal Title IX sexual harassment. Now before the Court is (1) Dr. James Clor, Jerry Maiorano and the Warren Consolidated School District's motion for summary judgment; and (2) Dr. Paul Stamatakis' motion for summary judgment.

## ANALYSIS

### A. Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." FED. R. CIV. P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

> Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548; *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 (6th Cir.1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or

---

22. The Board of Education set forth three charges: (1) Charge 1 was based on the sexual molestation of the three Plaintiffs in this case, allegations which included improper touching of the shoulders, buttocks, public area, and breast area; (2) Charge 2 was based on the harassment of Terry Stack; and (3) Charge 3 was based on Kearly disregarding written directives. (Pl.'s Resp. Br. Exh. 2, document 86–88.)

23. The following colloquy took place at Maiorano's deposition.

> Question: And what did you mean?
> Answer: Basically that I didn't want him to react at that point in time to whatever I might have done and I was just putting him off.

(Maiorano Dep. at 117.)

defense asserted by the parties." *Kendall v. Hoover Co.,* 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed.1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Conversely, where a reasonable jury could not find for the non-moving party, there is no genuine issue of material fact for trial. *Id.; Feliciano v. City of Cleveland,* 988 F.2d 649, 654 (6th Cir.1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.,* 749 F.2d 1205, 1210–11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548 (1986). The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). The rule requires the non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd Cty. Bd. of Ed.,* 106 F.3d 135, 145 (6th Cir.1997); *see also Anderson,* 477 U.S. at 252, 106 S.Ct. 2505 (holding that the non-moving party must

produce more than a mere scintilla of evidence to survive summary judgment).

## B. Count I—Michigan: Gross Negligence and Intentional Misconduct

■ The Court must grant summary judgment in favor of the Defendants with respect to Plaintiffs' claim of gross negligence and intentional misconduct.

Michigan Compiled Laws section 691.1407(1), applicable with respect to Defendant Warren Consolidated School District, provides:

> Except as otherwise provided in this act, a *governmental agency* is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function. Except as otherwise provided in this act, this act does not modify or restrict the immunity of the state from tort liability as it existed before July 1, 1965, which immunity is affirmed.

MICH. COMP. LAWS ANN. § 691.1407(1) (emphasis added). "Governmental agency" is defined as the state or a political subdivision. MICH. COMP. LAWS ANN. § 691.1401(d). "Political subdivision," in turn:

> means a *municipal corporation,* county, county road commission, *school district,* community college district, port district, metropolitan district, or transportation authority or a combination of 2 or more of these when acting jointly; a district or authority authorized by law or formed by 1 or more political subdivisions; or an agency, department, court, board, or council of a political subdivision.

MICH. COMP. LAWS ANN. § 691.1401(b) (emphasis added).[24] As such, the Warren

---

**24.** No argument is made that the District was not engaged in the exercise of a governmental function. The hiring of teachers by a Board of Education in the course of providing public education is a governmental function. *Galli*

*v. Kirkeby,* 398 Mich. 527, 537, 248 N.W.2d 149 (1976). The screening, hiring and supervision of school district personnel by a Board of Education in the course of its educational function is a governmental function. *Id.; see*

Consolidated School District is absolutely immune from Plaintiffs' claim of gross negligence. *Sayers v. School Dist. No. 1*, 366 Mich. 217, 114 N.W.2d 191 (1962).

■ The remaining individual Defendants are entitled to summary judgment pursuant to section 1407(2).[25] This section provides:

> Except as otherwise provided in this section, and without regard to the discretionary or ministerial nature of the conduct in question, each officer and employee of a governmental agency, each volunteer acting on behalf of a governmental agency, and each member of a board, council, commission, or statutorily created task force of a governmental agency is immune from tort liability for an injury to a person or damage to property caused by the officer, employee, or member while in the course of employment or service or caused by the volunteer while acting on behalf of a governmental agency if all of the following are met:
>
> (a) The officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority.
>
> (b) The governmental agency is engaged in the exercise or discharge of a governmental function.
>
> (c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is *the proximate cause* of the injury or dam-

age. As used in this subdivision, "gross negligence" means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results. MICH. COMP. LAWS ANN. § 691.1407(2) (emphasis added). Thus, under the terms of the statute, an employee is not entitled to governmental immunity if his or her gross negligence is "the proximate cause" of the plaintiff's injury or damage.

The Michigan Supreme Court in *Robinson v. City of Detroit*, 462 Mich. 439, 613 N.W.2d 307 (2000), overruled *Dedes v. Asch*, 446 Mich. 99, 521 N.W.2d 488 (1994), holding that the phrase "the proximate cause" means the one most immediate, efficient, and direct cause preceding an injury, not "a proximate cause." *Robinson*, 462 Mich. at 445–46, 613 N.W.2d 307. The Court stated:

> [I]t is clear that the phrase 'the proximate cause' contemplates *oné* cause.... '[T]he proximate cause' [means] the immediate efficient, direct cause preceding the injury.... [T]hus we conclude that in [MICH. COMP. LAWS ANN. § 691.1407(2)(c) ], the Legislature provided tort immunity for employees of governmental agencies unless the employee's conduct amounts to gross negligence that is the one most immediate, efficient, and direct cause of the injury or damages, i.e., the proximate cause.

*Robinson*, 462 Mich. at 462, 613 N.W.2d 307. In this case, "the proximate cause" of

---

*also Bozarth v. Harper Creek Board of Education*, 94 Mich.App. 351, 353, 288 N.W.2d 424 (1979).

**25.** With respect to Defendant Stamatakis, section 1407(5) also requires that summary judgment be granted. Defendant Stamatakis was employed as superintendent during his tenure with the District from 1993 to 1999. (Stamatakis Dep. at 16–17, 46.) Section 1407(5) provides: "A judge, a legislator, and the elective or highest appointive executive offi-

cial of all levels of government are immune from tort liability for injuries to persons or damages to property if he or she is acting within the scope of his or her judicial, legislative, or executive authority." Defendant Stamatakis, as superintendent, is the highest appointive executive of the school district, and thus is entitled to absolute immunity. *Nalepa v. Plymouth–Canton Community School District*, 207 Mich.App. 580, 589, 525 N.W.2d 897 (1994); *Soper v. Hoben*, 195 F.3d 845, 851 (6th Cir.1999).

Plaintiffs' injuries was Defendant Kearly's sexual molestation of the Plaintiffs—the sexual assault was the most immediate, efficient, and direct cause of the injuries. *See e.g., Clark v. State of Michigan,* Nos. 231769, 231854, 2002 WL 1463556, at *4 (Mich.Ct.App. July 5, 2002); *Ortiz v. Porter,* No. 226466, 2001 WL 1545914, at *2 (Mich.Ct.App. Nov. 30, 2001); *Estate of George v. State of Michigan,* 136 F.Supp.2d 695, 703 (E.D.Mich.2001). Thus, the individual defendants, who were acting within the scope of their authority, are entitled to governmental immunity.[26]

Plaintiffs argue that the holding in *Robinson* does not apply where, as in this case, all of the alleged instrumentalities of injury were state actors. There is no indication, however, that the holding of *Robinson* is so limited. The Michigan Supreme Court's conclusion was not based on the specific facts presented; instead, the Court arrived at its conclusion based upon the clear and unambiguous language of the statute. *Robinson,* 462 Mich. at 458–463, 613 N.W.2d 307; *see also Clark, supra* at *4 ("Plaintiff argues that *Robinson* does not apply because it is factually distinguishable and involved motor vehicles, and that if *Robinson* does apply this Court should refuse to apply it and follow the dissent in *Robinson.* Neither assertion has merit. The *Robinson* Court's language regarding the phrase 'the proximate cause' in M.C.L. § 691.1407(2)(c), quoted *supra,* is not limited.").

## C. Count II—Federal: 42 U.S.C. § 1983

42 U.S.C. § 1983 provides, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

In order to establish a prima facie case under 42 U.S.C. § 1983, a plaintiff must establish that (1) the individual defendant was acting under color of state law; and (2) the defendant deprived the plaintiff of his rights secured by the United States Constitution. *Neuens v. City of Columbus,* 303 F.3d 667, 670 (6th Cir.2002) (citation omitted); *Wolotsky v. Huhn,* 960 F.2d 1331, 1334–35 (6th Cir.1992) (citation omitted).

### 1. Individual Defendants

The individual defendants argue that they are entitled to qualified immunity with respect to Plaintiff's § 1983 due process claim.

### (i) Qualified Immunity Standard

Government officials are afforded qualified immunity for their discretionary functions, as long as the conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Sandul v. Larion,* 119 F.3d 1250, 1254 (6th Cir.1997)

---

**26.** Count I of Plaintiffs' Complaint also alleged "intentional misconduct." No evidence with respect to any intentional tort was presented by Plaintiffs with respect to the Defendants involved in the instant motions (all Defendants except Defendant Kearly) and no argument was made by the Plaintiffs with respect to any "intentional misconduct" on the part of these Defendants.

(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)); *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 902 (6th Cir.1998). When a defendant seeks qualified immunity, the court should address the issue early on in the proceedings "so that the costs and expenses of trial are avoided where the defense is dispositive." *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 2155–56, 150 L.Ed.2d 272 (2001). While the Defendants in this case bore the burden of pleading the affirmative defense of qualified immunity, the "ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity." *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir.2002) (citations omitted).

The Supreme Court recently clarified the appropriate analysis to be used when evaluating a claim of qualified immunity. According to *Saucier*, a court must perform a two-step sequential inquiry. *See Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002); *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir.2001). First, as a threshold matter, the district court must determine whether the facts, taken in a light most favorable to the injured party, show that the officer's conduct violated a constitutional right. *Saucier*, 121 S.Ct. at 2156; *Comstock*, 273 F.3d at 702. "If no constitutional right would have been violated were the allegations established, there is no [need] for further inquir[y] concerning qualified immunity." *Saucier*, 121 S.Ct. at 2156. However, if a violation could be established, taking the facts in a light most favorable to the injured party, the court must determine whether the right was clearly established. *Id.* The issue whether a right was clearly established is a legal

question which must be determined by the Court.

█ An noted in *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the injured party must allege more than an abstract right, such as the right to due process, or the right to be free from excessive force under the Fourth Amendment; instead, the right must be clearly established in a "more particularized, and hence more relevant sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier*, 121 S.Ct. at 2156 (discussing *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034). Thus, according to the Supreme Court, a right is clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*; *Phelps*, 286 F.3d at 299. Stated another way, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Saucier*, 121 S.Ct. at 2157 (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). Qualified immunity protects a government official who "reasonably acted unreasonably." *Id.* (discussing *Anderson, supra*). As recently noted by the Sixth Circuit, a court "need not, of course, find a case in which 'the very action in question has previously been held unlawful,' but, 'in the light of pre-existing law[,] the unlawfulness must be apparent.'"[27] *Comstock*, 273 F.3d at 702 (quoting *Saucier*).

### (ii) Violation of a Constitutional Right

█ The Due Process Clause of the Fourteenth Amendment clearly protects

---

27. In order to determine whether a right is clearly established, the Court must look to decisions rendered by the United States Supreme Court, the Court of Appeals, or the highest court of the state in which the alleged constitutional violation occurred. *Durham v. Nu'man*, 97 F.3d 862, 866 (6th Cir.1996) (citation omitted).

the right of a child to be free from sexual abuse inflicted by a public school employee/teacher. *See Doe v. City of Roseville,* 296 F.3d 431, 438 (6th Cir.2002) (discussing *Doe v. Claiborne County, Tenn.,* 103 F.3d 495 (6th Cir.1996) and *Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977)). Thus, Plaintiffs' constitutional right to be free from sexual abuse at the hands of Defendant Kearly was clearly established at the time of the alleged abuse. The liability of Kearly, however, is not currently before the Court. Instead, Plaintiffs seek to hold Defendant Stamatakis, former Superintendent of the District, Defendant Clor, current Superintendent and former Associate Superintendent in charge of elementary education, and Defendant Maiorano ("Maiorano"), Principal of Siersma Elementary School, directly liable under § 1983.

In *Roseville,* the Sixth Circuit reiterated that in an earlier decision, the court explicitly stated that the "supervisory liability" test established in *Bellamy v. Bradley,* 729 F.2d 416 (6th Cir.1984), applied to individual defendants who had supervisory responsibility over the school employee/teacher-i.e., school administrators may be held liable for the constitutional injury caused by the teacher/employee under the long-established supervisory liability test. *Roseville,* 296 F.3d at 439 (discussing *Claiborne County,* 103 F.3d at 513).

However, as outlined in *Roseville* and *Claiborne County,* this standard of liability is an onerous one. A defendant cannot be found liable if he or she was merely "sloppy, reckless or negligent in the performance of their [supervisory] duties." *Id.* at 439. Instead:

"[a] plaintiff must show that, in light of the information the defendants possessed, the teacher who engaged in sexual abuse showed a *strong likelihood* that he would attempt to sexually abuse other students, *such that the failure to take adequate precautions amounted to deliberate indifference to the constitutional rights of students."* *Claiborne County,* 103 F.3d at 513 (internal quotation marks omitted). Put another way, we said, the plaintiff must show that the "defendants' conduct amounted to a *tacit authorization* of the abuse." *Id.* (citing *Bellamy,* 729 F.2d at 421). We concluded that

[d]efendants here were simply not *confronted with such a widespread pattern of constitutional violations* that their actions or inactions amounted to a deliberate indifference to the danger of Davis sexually abusing students. The steps they did take, and even those they failed to take and arguably should have taken, do not show that they "encouraged the specific incident of misconduct or in some other way directly participated in it." Nor did they authorize, approve, or knowingly acquiesce in Davis's unconstitutional conduct. They had no knowledge, constructive or otherwise, that Davis was abusing Doe.

*Id.* (internal citations omitted).

*Id.* (emphasis added). The Sixth Circuit went on to note that allegations that a supervisor failed to act were insufficient— "[i]n the absence of any allegation that the supervisors had 'participated, encouraged, authorized or acquiesced in' the offending conduct ... supervisors had, as a matter of law, 'neither committed a constitutional violation nor violated a clearly established right.'" *Id.* at 439–40. The court also cited with approval a decision of the Eleventh Circuit Court of Appeals. There, the court noted that the deprivations that constitute widespread abuse sufficient to notify the supervisor must be "obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences." *Id.* at 440, 440–41 (quoting *Braddy v. Florida*

*Dep't of Labor & Employment Sec.,* 133 F.3d 797, 802 (11th Cir.1998)).

Such Sixth Circuit precedent presents a high hurdle for Plaintiffs to overcome. However, a review of the record currently before the Court reveals that this case presents the rare instance in which summary judgment is not appropriate under this standard. A summary of *Roseville* and *Claiborne County* is instructive.

### (a) Doe v. City of Roseville, 296 F.3d 431 (6th Cir.2002)

In *Roseville,* the plaintiff alleged that she was sexually abused by John Lomnicki, her elementary school reading teacher during the years 1992 and 1993. *Roseville,* 296 F.3d at 433–34. Lomnicki was hired by the school district in 1960. During the 1975–76 academic year, several girls alleged that Lomnicki touched them in an inappropriate manner. Principal Slinde allegedly told one of the girl's father that "she did not see how it could be possible." Slinde did not document the incident or report it to anyone: she did, however, give Lomnicki an oral warning. *Id.* at 434.

The next year, more allegations of improper touching surfaced. Principal Slinde allegedly questioned the girls and told them that "she did not want to hear anymore talk about it," Slinde also allegedly cautioned the girls that they were not supposed to tell anyone of the touching, even their parents. *Id.*

Lomnicki was then transferred to a different elementary school. Slinde, however, did not inform the school of Lomnicki's oral reprimand. In 1979, Superintendent Mayer was notified that Lomnicki had fondled the breasts of four sixth-grade girls. Mayer investigated, determined that Lomnicki used "poor judgment," and issued a written, sealed reprimand. *Id.* at 435.

Lomnicki was subsequently transferred to Arbor Elementary School, where he taught individual students, one at a time, in a private classroom. When the transfer was effectuated, school officials, once again, were not informed of the oral reprimand or the sealed written reprimand. No allegations of improper conduct were made until 1988 when several sixth-grade girls reported improper touching by Lomnicki (hugging, back rubs, forcible hand holding). Assistant Superintendent Herron and Superintendent Mayer were informed of the allegations. Herron conducted an investigation and a sealed reprimand was once again issued to Lomnicki for "poor judgment." Additionally, Mayer sent a confidential memorandum to the board of education and the district's attorney, informing them of the two incidents for which Lomnicki received written sealed reprimands. *Id.* at 435. Mayer notified the County Child Abuse Office and transferred Lomnicki to Eastland Elementary School. *Id.*

Lomnicki occupied a similar position at Eastland Elementary-teaching individual students, one at a time. It is here, in 1992 and 1993, that the plaintiff alleged that Lomnicki committed horrific acts of sexual abuse, the details which are not important to the instant discussion. The plaintiff however, did not immediately notify her parents or school authorities of the abuse. *Id.* at 436–37. Instead, in early 1993, a criminal investigation was commenced against Lomnicki with respect to an unrelated matter—the sexual abuse of his neighbor. Superintendent Kment was informed of the police investigation in January or February 1993—Lomnicki was removed from direct contact with students, and the criminal investigation became known to the community at large in March, 1993. *Id.* at 436. Approximately twenty-one months later, in December, 1994, plaintiff's mother reported her daughter's allegations. Director of Special Education Silava immediately filed a re-

port with the Michigan Department of Social Services; however, she stated that the perpetrator of the abuse was unknown but possibly might be in the household. The plaintiff's litigation ensued. *Id.* at 437.

The Court first addressed the actions of Slinde, Mayer and Herron, the three employees who were no longer employed by the district at the time the plaintiff was allegedly abused. The court acknowledged that the conduct of the three defendants was "disturbing." *Id.* at 440. However, according to the court:

> Nothing that these defendants did or did not do encouraged Lomnicki's abuse of Jane, constituted participation in that abuse, or authorized, approved or knowingly acquieseed in it. *Id.*
>
> Viewed from the perspective of the twenty-first century, the responses of these three defendants to reports of Lomnicki's conduct are disturbing. Hindsight reveals that Lomnicki was a pedophile. But our task is not to reconstruct the reality of Lomnicki's proclivities. Our task is to determine whether defendant Slinde, a quarter of a century ago, defendant Mayer, in 1979 and 1988, and defendant Herron, in 1988, were confronted with conduct that was "obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences," *Braddy,* 133 F.3d at 802, or with "such a widespread pattern of constitutional violations," *Claiborne County,* 103 F.3d at 513, that their actions demonstrated deliberate indifference to the danger of Lomnicki's sexually abusing students. We hold that they were not. We cannot weave the threads of such a pattern on the loom of hindsight, and the facts as Jane portrays them do not demonstrate anything more than negligence on the part of these defendants.

Although Jane had a constitutional right to be free from sexual abuse at the hands of a school teacher or official, she did not have a constitutional right to be free from negligence in the supervision of the teacher who is alleged to have actually abused her. Negligence is not enough to impose section 1983 liability on a supervisor. *Claiborne County,* 103 F.3d at 513.

*Id.* at 440–41.

Similarly, the Court found that Superintendent Kment did not violate the plaintiff's constitutional rights. The Court stated:

> It is undisputed that defendant Kment was not aware of any of Lomnicki's history of alleged misconduct with female students. Defendant Kment learned no earlier than the beginning of January 1993, of the police investigation into Lomnicki's alleged abuse of Sarah Williams. By early March, Kment had removed Lomnicki from the classroom. There is no dispute that Kment had no knowledge of Lomnicki's alleged abuse of Jane until the end of 1994. The facts as Jane portrays them do not demonstrate any causal connection between any action or inaction of Kment and any injury to Jane, and therefore do not allege a violation of any constitutional right.

*Id.* at 441.[28]

### (b) *Doe v. Claiborne County, Tenn.,* 103 F.3d 495 (6th Cir.1996)

In *Claiborne County,* the plaintiff alleged that she was sexually harassed, abused and raped by a school teacher, Jeffrey Davis, a physical education teacher, in 1991 and 1992. *Claiborne County,* 103 F.3d at 500–01. Allegations with re-

---

**28.** A similar conclusion was reached with respect to Defendant Silava. *Roseville,* 296 F.3d at 441.

spect to Davis first surfaced in 1989 while he was a teacher at Midway School. At that time, Principal James Bundren was informed that Davis allegedly touched a female student in an inappropriate manner. A meeting was convened by Bundren with Davis, former Superintendent Peters, and the student's family. Davis contended that nothing inappropriate occurred between the two, an explanation which apparently satisfied the student's mother. Bundren warned Davis "not to be so friendly with [the] students," and placed a note of the meeting in Davis' personnel file. Id. at 501–02.

A few months later, in January, 1990, Superintendent Peters was notified by the Department of Human Services ("DHS") that Davis had allegedly sexually abused nine different girls at Midway School. Two months later, the DHS informed Peters that Davis was still under investigation and that "immediate action" needed to be taken to ensure that Davis would have "no access to or contact with any child." The district promptly removed Davis from student contact and chose not to rehire him for the upcoming school year. Id. at 502.

Thereafter, the DHS concluded that four of the nine allegations were "founded." Davis negotiated a "pre-trial agreement" with the DHS in which the DHS agreed (1) that criminal proceedings, if any, would be brought by the alleged victims, not the DHS; (2) the DHS would not place Davis' name on a registry; and (3) although the DHS would notify the board of education of its finding, it would not take an active role in seeking the suspension of his teaching license. Interim Superintendent Dobbs interpreted the letter "to be an exoneration of Davis." Id. at 502–03.

Thereafter, based on a promise made by school board chairman Burchette that the school board would approve Davis' rehiring, Defendant Barnard, principal at Sol-

diers Memorial Middle School ("SMMS") personally offered Davis the position of physical education teacher and coach at SMMS. When Davis started to explain the DHS charges, Barnard responded that he didn't "want to hear about it." Although Barnard knew that DHS had requested that Davis refrain from student contact, he made no further inquiries because he believed that Davis had been exonerated of all charges based on the pre-trial agreement. In September, 1990, the school board officially rehired Davis. At the hearing, Superintendent Norris testified that he inspected Davis' personnel file and interpreted the information as consisting of "unfounded charges." Id. at 503.

Because of the DHS charges and other rumors and accusations, Principal Barnard began to closely supervise Davis. In fact, Barnard's permission was specifically requested with respect to the use of the plaintiff as a scorekeeper for Davis' basketball team. Barnard responded: "If you can't find anybody else. If we can't find anybody else." Davis began to sexually abuse the plaintiff shortly thereafter. Id. at 503.

The Sixth Circuit affirmed the district court's dismissal of the plaintiff's section 1983 claims against Superintendents Peters and Norris, and Principal Barnard. The court stated:

It may be freely conceded that the actions of these individuals left a lot to be desired. They may have been sloppy, reckless, or neglectful in the performance of their duties. But that is not enough for section 1983 liability under the precedent laid down in Bellamy, 729 F.2d 416, and Barber v. City of Salem, 953 F.2d 232 (6th Cir.1992). * * * *

Defendants here were simply not confronted with such a widespread pattern of constitutional violations that their actions or inactions amounted to a deliber-

ate indifference to the danger of Davis sexually abusing students. The steps they did take, and even those they failed to take and arguably should have taken, do not show that they "encouraged the specific incident of misconduct or in some other way directly participated in it." *Id.* Nor did they authorize, approve, or knowingly acquiesce in Davis's unconstitutional conduct. *Id.* They had no knowledge, constructive or otherwise, that Davis was abusing Doc. We therefore affirm the dismissal of the claims against Peters, Norris, and Lynn Barnard on grounds other than those stated by the district court.

*Id.* at 513.

### (iii) Application of *Roseville* and *Claiborne County* to the Instant Case

The Court will address each individual defendant in turn.

### *Defendant Stamatakis*

■ Defendant Stamatakis claims that he approved Kearly's transfer because he did not feel that the information contained in Kearly's "personnel file" supported tenure charges. Stamatakis notes that the District had purged Kearly's personnel file, including many allegations of improper conduct/touching. Thus, he claims to have made the best decision based on the information available at the time. In fact, Stamatakis claims that if all of the information regarding Kearly's prior conduct had been maintained in his personnel file, he may have made a different decision. Consequently, Stamatakis argues that his conduct, even viewed in hindsight, amounts to nothing more than mere negligence.

However, taking the facts in a light most favorable the non-moving party, Stamatakis' claim that he was hampered by a lack of information is untenable. Marsha Pando, Associate Superintendent of Human Resources, testified that high level meetings occurred prior to the transfer in which Sharon Hughes, the District's Director of Personnel, presented material which had been purged from Kearly's personnel file. Additionally, Ms. Hughes voiced her concern directly to Stamatakis that Kearly was a threat to elementary school students. Testimony in the record reveals that when confronted with this information, Stamatakis characterized Kearly as a "scumbag." Stamatakis' also received a memorandum from Ms. Hughes which included documents from Kearly's file; Hughes argued that the "incidents are severe enough and recent enough to warrant concern. I strongly urge that you support administration's decision to deny his transfer to elementary physical education."

Having been confronted with the documentation, and having concluded that Kearly's long history of misconduct rendered him a "scumbag," Stamatakis still decided, as part of concessions made during the District's collective bargaining with the WEA, to resolve the grievance in Kearly's favor, and allow him to return to the elementary school level. In doing so, Stamatakis "did an end around" the normal chain of command, ignoring Roger Allen, the then Associate Superintendent of Human Resources, who would have vehemently argued against the transfer. Furthermore, Stamatakis made this decision despite acknowledging that if there is a concern that a teacher could be harming students, it is imperative that the district err on the side of caution and protect the students, even if it means breaking a contract. Most troubling, however, is the fact that Stamatakis actually testified that he based his decision, at least in part, on his opinion that a transfer might be appropriate because Kearly would be removed from the middle school setting where there were older, more developed girls that might attract Kearly. Thus, despite the fact that Stamatakis acknowledges that

younger girls are more vulnerable to sexual predators such as Kearly, (Stamatakis Dep. at 93), Stamatakis decided to place Kearly at the elementary school level in the hope that he would not be attracted to very young girls. Such conduct goes well beyond mere negligence, indeed, transcends gross negligence, and borders on gross incompetence.[29] At a minimum, taking the facts in a light most favorable to the Plaintiffs, Stamatakis' conduct exhibits deliberate indifference.

Stamatakis was not satisfied, however, with merely approving the transfer. Taking the facts in a light most favorable to the non-moving party, Stamatakis' wrath fell upon the individual who most strongly, and most publically, opposed the transfer—Sharon Hughes. Ms. Hughes was reprimanded for her failure to properly purge employee files and for making recommendations "without making a diligent review of the applicable personnel file . . . and by considering matters which by agreement were to have been destroyed or expunged from the employees personnel file." (Pl.'s Resp. Br. Exh. 3, document 1277; Hughes Dep. at 104—noting that she was reprimanded for the handling of the Kearly case.) Ms. Hughes was later removed from her position as Director of Personnel and banished to the position of technical education supervisor. (Hughes Dep. at 10.)

Stamatakis' deliberate indifference did not end here. Shortly after the transfer, Kearly once again began a course of improper conduct. This included grabbing his crotch in front of a class, hugging fifth grade girls, and allegedly kissing an elementary school girl on the lips. Stamatakis' transfer order permitted Kearly to remain in direct contact with students, notwithstanding Director Hughes' second strong warning to Stamatakis:

> It is again with *grave concern that I have approached you on this matter of Mr. Kearly and elementary girls. The safety and welfare of our students is our most important charge.* Since I have not heard from you, this is to clarify that it is my expectation that you will either conduct or direct whatever investigation or procedures you believe to be appropriate in this matter.

(District's Br. Exh. A, document 515) (emphasis added).

29. The following colloquy took place at Ms. Hughes' deposition:
   Answer: Mr. Kearly was just a playing card in a political conspiracy.
   Question: And the political conspiracy was intending to do what?
   Answer: Give power to the people who wanted the power.
   Question: Fair statement to say that in your opinion the way that the Kearly matter was handled, and ultimately allowed to get to my three clients, was the result of gross incompetence on the part of the district in not removing him earlier.

   \*   \*   \*   \*   \*   \*

   Answer: I would say negligence.
   Question: Gross negligence? Ma'am, you're shaking your head.
   Answer: Yes.
   Question: All the warning signs, as director of personnel, all the warning signs were there, you alerted others to the warning signs and nothing was done, fair statement?
   Answer: Correct. My credibility was minimized.
   Question: When you saw your credibility was minimized, ma'am, no one ever responded to your warnings, did they? It isn't a question of minimizing, they just didn't respond to it at all, did they?
   Answer: No to me?
   Question: Nor did they do anything except transfer him so that he could molest my three clients, right?
   Answer: They transferred him, yes.
   Question: Allowing him to be in a situation where he could molest my three clients, correct?
   Answer: Setting up that potential, yes.
   (Hughes Dep. at 258–59.)

Therefore, this case is distinguishable from *Roseville*. Unlike *Roseville*, Superintendent Stamatakis was not faced with a few isolated occurrences—in *Roseville*, Principal Slinde was aware of two instances in the 1970's, and Superintendent Mayer was aware of one incident in 1979 and one in 1988. Here, taking the facts in a light most favorable to the Plaintiffs, Kearly showed a strong likelihood that he would attempt to sexually abuse other students—Stamatakis was faced with a widespread pattern of violations that were "obvious, flagrant, rampant and of continued duration." Furthermore, unlike *Roseville*, where, for example, Superintendent Mayer reprimanded the teacher, informed the Board of Education, and notified the County Child Abuse Office after a second instance occurred in a ten year time period, Stamatakis' conduct documented above, taken in a light most favorable to the Plaintiffs, clearly amounts to deliberate indifference to the constitutional rights of the Plaintiffs, in affect acquiescing in Kearly's long and continued pattern of unconstitutional misconduct. Consequently, Defendant Stamatakis is not entitled to qualified immunity with respect to Plaintiffs' section 1983 claim, and Defendants motion for summary judgment on this count is denied with respect to Defendant Stamatakis.[30]

### Defendant Clor

■ Similarly, summary judgment must also be denied with respect to Defendant Clor. According to Dr. Clor, he no knowledge of Kearly's past misconduct other than a vague understanding that Kearly had been acquitted of an unspecified criminal charge. Thus, Dr. Clor contends that his alleged inaction, even in the face of observing a single instance in which Kearly allegedly kissed a female student (which he strongly disputes) during the period he had been placed on "Kearly's case" by the Superintendent, while maybe disturbing in hindsight, does not indicate that he "participated, encouraged, authorized or acquiesced in" the offending conduct. Simply stated, Clor argues that he was not confronted with a widespread pattern of constitutional deprivations that were "obvious, flagrant, rampant, and of continued

---

30. None of the individual defendants have argued, either in their briefs submitted to the Court or at oral argument, that the constitutional right alleged was not clearly established. According to the Sixth Circuit, looking at the evidence in a light most favorable to Plaintiff, if the alleged facts show a violation of a constitutional right, then the Court must determine whether the right was clearly established, *i.e.*, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Klein v. Long, et al.*, 275 F.3d 544, 550 (6th Cir.2001)(citing *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). In order to determine whether a right is clearly established, the Court must look to decisions rendered by the United States Supreme Court, the Court of Appeals, or the highest court of the state in which the alleged constitutional violation occurred. *Durham v. Nu'man*, 97 F.3d 862, 866 (6th Cir.1996) (citation omitted).

A plaintiff's assertion of a violation "of a broadly stated general right is not determinative." *Rippy v. Hattaway*, 270 F.3d 416, 424 (6th Cir.2001). The Sixth Circuit has held that:

> the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must have been sufficiently clear that a reasonable official would understand that what he is doing violates the right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of preexisting law the unlawfulness must be apparent.

*Id.* (citation omitted). Here, pursuant to *Bellamy* and *Claiborne County*, the Court concludes that the constitutional right alleged by the Plaintiffs was clearly established.

duration, rather than isolated occurrences."

The Court disagrees. As with Dr. Stamatakis, testimony from Marsha Pando, Associate Superintendent for Human Resources, taken in a light most favorable to the Plaintiffs, establishes that Dr. Clor was well aware of Kearly's long history of misconduct and inappropriate touching—he was aware of a widespread pattern of constitutional violations. Despite this knowledge on Clor's part, Ms. Pando testified that she was under the impression that Dr. Clor personally vouched for Kearly during the transfer debate.

Moreover, according to Stamatakis, Dr. Clor was placed in charge of making sure that Kearly was closely supervised.[31] Dr. Clor was aware that Kearly was prohibited from touching students and from using student aides. (Pando Dep. at 132.) Notwithstanding this knowledge, and the concerns surrounding Kearly's placement at the elementary school level, Dr. Clor allegedly did nothing after witnessing Kearly kiss an elementary school girl on the lips.[32] In fact, according to Mr. Maiorano, Dr. Clor never even told him that Kearly was to be closely supervised. (Maiorano Dep. at 122.) Such conduct—allowing Kearly to get away with kissing a girl on the lips without any discipline or close supervision—after both Clor and Kearly were informed that Kearly could not touch students or use student aides, creates a genuine issue of material fact as to whether Dr. Clor "acquiesced-in," or even encouraged Kearly's future misconduct. Summary judgment, therefore, must be denied with respect to Plaintiffs' § 1983

claim against Defendant Clor—a genuine issue of material fact exists with respect to whether Dr. Clor was deliberately indifferent to the Plaintiffs' constitutional rights.

### Defendant Maiorano

■ Like Defendants Stamatakis and Clor, Defendant Maiorano's claim of ignorance with respect to Kearly's long history of misconduct is certainly subject, based on the record currently before the Court, to attack by the Plaintiffs at trial. Maiorano claims that he was unaware of most of Kearly's past misconduct; he contends that he was only aware of rumors and innuendo which he chose not to believe.

However, Maiorano and Kearly remained close friends into the 1990's. Maiorano, moreover, was Kearly's drinking buddy and was godfather to one of Kearly's children. Given Maiorano's admitted thirty-year friendship with Kearly, a reasonable jury could conclude that he was aware of his friend's long history of improper behavior. Such a conclusion is buttressed by Maiorano's actions after Kearly was removed from Siersma Elementary School. After Maiorano was confronted with the specific details surrounding the sexual molestation of the Plaintiffs, Kearly was asked to remove his personal belongings from the building. On his way out, Kearly told Maiorano: "Love you, brother." (Maiorano Dep. at 117.) Maiorano acknowledges that Kearly was hoping that he would cover for him. (*Id.*) Maiorano responded: "Don't worry about it, it's okay." (*Id.*) Credibility determinations must be made by the jury, not this Court.

---

**31.** In fact, a memorandum prepared by Stamatakis after the 1996 incidents indicates that Dr. Clor was directed to "investigate the matter," and that "Dr. Clor has assured me that the matter is being closely supervised." (District's Br. Exh. A, document 1060.) According to Stamatakis, Clor "[orally] reprimanded or told [Kearly] that that type of behavior [was] not to be ... condoned." (Stamatakis Dep. at 84.)

**32.** Clor did not inform Ms. Pando of the incident. Ms. Pando would have investigated the matter. (Pando Dep. at 144–45, 152.)

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Furthermore, Maiorano acknowledges that he was informed that Kearly was not allowed to use student aides when working with younger students.[33] Notwithstanding knowledge of this restriction, and the fact that Maiorano acknowledges that he was the only administrator at Siersma Elementary School,[34] evidence before the Court, taken in a light most favorable to the Plaintiffs, indicates that Maiorano gave Kearly explicit permission to use student aides. Kearly allegedly sexually assaulted the Plaintiffs while they were aides in Kearly's gym class. Furthermore, Maiorano was well aware that the District had placed Kearly on a special yearly evaluation cycle—a red flag.[35]

Thus, a reasonable jury could conclude that Maiorano, who maintained an ongoing personal relationship with Kearly into the 1990's, had knowledge of Kearly's widespread pattern of sexual abuse/misconduct with female students. Moreover, taking the facts in a light most favorable to the Plaintiffs, a reasonable jury could conclude that Maiorano "acquiesced in" the offending conduct, by giving Kearly permission to use student aides despite explicit instructions to the contrary.

Consequently, Defendant Maiorano is not entitled to qualified immunity with respect to Plaintiff's section 1983 claim, and Defendants motion for summary judgment on this count is denied with respect to Defendant Maiorano.

## 2. Warren Consolidated School District

The Warren Consolidated School District may be liable under 42 U.S.C. § 1983. *See Monell v. Department of Soc. Servs.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 ("Congress did intend municipalities and other local government units to be included among those persons to

---

**33.** In fact, on November 7, 1997, before the Plaintiffs were allegedly molested by Kearly, Marsha Pando sent a memorandum to Maiorano indicating that Kearly "had his evaluation period extended as a result of less than satisfactory teaching performance in the 1996–97 school year," and that Kearly's performance was to be "carefully monitored" during the 1997–98 school year. (District's Br. Exh. E, document 538.)

**34.** The following colloquy took place at Maiorano's deposition:
Question: Do you have any other administrators in the building?
Answer: Other than myself, no.
(Maiorano Dep. at 11.)

**35.** In fact, Mr. Maiorano did not even review Kearly's personnel file after Kearly was transferred to Siersma Elementary School. (Maiorano Dep. at 32.) Maiorano was the only administrator at the school. Maiorano conducted absolutely no investigation despite being aware that Kearly had a drinking problem, despite being aware of Kearly's criminal trial, despite being aware of other rumors and innuendo (choosing not to believe them because of their thirty year friendship), and despite being aware that Kearly was on a special yearly evaluation cycle. (Maiorano Dep. at 34–40, 56, 128–29.) Indeed, Maiorano testified that even if he had known about Maiorano's entire history, he might not have been able to stop the sexual molestation of the Plaintiffs because the molestation was "not done in front of me." The following colloquy took place at his deposition:

Question: That's my point. I just want to make sure I understand your position; you couldn't do anything to prevent what happened to my three clients because you didn't know anything about this man's history, correct or not correct?
Answer: Correct, but if I had known, I'm not sure I could have done anything anyway because these things were not done in front of me.
(Maiorano Dep. at 96.) Maiorano's testimony—that Kearly could do anything to students and get away with it as long as it wasn't done in his presence—supports the Court's conclusion that Maiorano acted with deliberate indifference with regard to Kearly's conduct.

whom § 1983 applies."). A municipality, however, cannot be held liable under section 1983 solely because it employs a tortfeasor—"in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691, 98 S.Ct. 2018 (emphasis in original). Instead, a plaintiff must establish that the local government unit *itself* is the wrongdoer. *Claiborne County,* 103 F.3d at 507. A school district or board of education, therefore, cannot be liable under section 1983 unless "an officially executed policy, or the toleration of a custom within the school district leads to, causes, or results in the deprivation of a constitutionally protected right." *Id.* (citing *Monell,* 436 U.S. at 690–91, 98 S.Ct. 2018).

### (a) "Custom" Under Monell

■ The Court concludes that a genuine issue of material fact exists with respect to whether section 1983 liability exists due to a "custom" of inaction. Although Plaintiffs' brief speaks of "affirmative acts" by the District, it is clear that Plaintiffs contend that the District's actions and/or policies amounted to a "custom of inaction"—i.e., failing to prevent sexual abuse by teachers after repeated notice of instances which would indicate that the teacher was a pedophile. Such a theory was recognized by the Sixth Circuit in *Claiborne County.*

A "custom" under *Monell* must " 'be so permanent and well settled as to constitute a custom or usage with the force of law.' " *Claiborne County,* 103 F.3d at 507 (quoting *Monell,* 436 U.S. at 691, 98 S.Ct. 2018). It must reflect a course of action deliberately chosen from among various alternatives. *Id.* at 508 (citing *City of Oklahoma v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)). If a custom is established, a plaintiff must also show that his or her injury was incurred because of the execution of that policy. *Id.* (citation omitted). Consequently, according to the

Sixth Circuit, a plaintiff must establish four elements:

(1) the existence of a clear and persistent pattern of sexual abuse by school employees;

(2) notice or constructive notice on the part of the School Board;

(3) the School Board's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and

(4) that the School Board's custom was the "moving force" or direct causal link in the constitutional deprivation.

*Id.* (citations omitted).

Here, taking the facts in a light most favorable to the Plaintiffs, a genuine issue of material fact exists with respect to whether the District had a "custom" of failing to prevent the sexual abuse of its students after repeated notice of improper conduct. The evidence set forth above clearly establishes a persistent pattern of sexual abuse by Kearly. Instances of misconduct began in 1984, and continued on a consistent basis until Kearly ultimately abused the Plaintiffs in this case in 1998. Furthermore, because the Board of Education delegated responsibility over personnel matters involving teachers, no matter how serious, to the superintendent and his administrative staff, (Pl.'s Resp. Br. Exh. 17), the District clearly was on constructive notice of this pattern of misconduct.

Moreover, a reasonable jury could conclude that the District had a custom of deliberate indifference to the sexual abuse of students by Kearly. First, as just noted, evidence exists that the Board of Education had a practice and policy of delegating personnel matters involving teachers, no matter how serious, to the superintendent and his administrative staff. As such, Board member Geralyn Thueme acknowledges in a sworn affidavit that the Board

was generally not informed of these matters.[36]

Additionally, the District's response to several of Kearly's instances of inappropriate sexual behavior reveals a custom of deliberate indifference. For example, taking the facts in a light most favorable to the Plaintiffs, after Kearly sexually harassed Ms. Stack, the District brokered a deal in which Ms. Stack agreed not to file formal sexual harassment charges in order to keep her job. In fact, Ms. Stack submitted an affidavit in which she stated that Associate Superintendent Beckett "told me that if I wanted to keep [my] job, I would not take this any further."

The District's handling of Kearly's mistreatment of LW also raises serious concerns. Principal Moy conducted an internal investigation into LW's accusations— the investigation not only confirmed the allegations of mistreatment, but also contained consistent accounts of other highly inappropriate sexual behavior by Kearly. Notwithstanding this fact, the District did not reprimand Kearly, instead, it merely

issued a "letter of direct order" regarding future professional conduct. Even more troubling, after Kearly was bound over on charges of assault and battery, Thomas Dettloff, the lead investigator in the case, testified by way of affidavit that the District was only "minimally cooperative" with his investigation, failing to provide numerous documents accumulated by the District which would have "substantially strengthened" the case against Kearly. Furthermore, the District treated Kearly's acquittal, based on the criminal "reasonable doubt" standard, as an exoneration of all charges, notwithstanding the fact that its own investigation confirmed LW's allegations. Associate Superintendent Beckett not only expressed "relief" at the verdict, but he also had Kearly's personnel file expunged of all reference to LW's accusations. Finally, Kearly's suspension was changed by the District to a "conference leave of absence",[37] (District's Br. Exh. A, document 1304), effectively prohibiting anyone who reviewed his file in the future from learning that anything improper took place.[38]

---

36. In 1998, the assistant superintendent in charge of personnel began reporting directly to the Board of Education. (Stamatakis Dep. at 19–20.)

37. A conference leave of absence "is where you go and learn something and are paid your salary to be absent while you're doing it," for example, a workshop about a new teaching technique or a seminar on some new curriculum. (Hughes Dep. at 214.)

38. Even Dr. Stamatakis, the District's superintendent, was unable to interpret the 95–day "conference leave." The following colloquy took place at Stamatakis' deposition:

Question: Matter of fact, let's talk about that a minute. You saw that he was out for almost 95 days on conference leave, right?
Answer: Correct
Question: Tell me what a conference leave is, sir?
Answer: I don't know.

Question: You don't?
Answer: No.
Question: Conference leave, that's a term that's used in a lot of school districts, isn't it? When—if—if Dr. Socol was going to go to a conference, she'd submit a request form saying, I'm going to be out to go to a conference, right?
Answer: Right.
Question: That's what a conference leave is?
Answer: That is the normal definition of a conference, but I don't know what a 95–day conference leave is.
Question: There is no such thing, is there?
Answer: I don't know.
Question: Have you ever heard of it?
Answer: I haven't heard of it, but it doesn't mean that it doesn't exist. Somewhere, somebody came up with it.
(Stamatakis Dep. at 73–74.) Additionally, with regard to the lack of proper documentation of Kearly's conduct, after several instances of improper touching, no documentation was created by the District.

Most disturbing, however, is the District's maintenance of employee personnel files. The Collective Bargaining Agreement, negotiated by the District, provided that upon request by a teacher, letters of reprimand "shall" be removed after three years, unless similar discipline has occurred.[39] (Pl.'s Resp. Br. Exh. 11.) The rule applies universally. Thus, as noted by the Plaintiffs, no exception existed for instances involving serious moral turpitude or other matters directly affecting the safety of the District's students. Thus, this policy, as well as the District's repeated failure to issue formal written reprimands in the face of Kearly's misconduct, prevented district officials from being able to compile an accurate and comprehensive official "personnel file" documenting Kearly's long history of improper behavior—documents which if maintained in Kearly's "personnel file," would clearly exhibit a pattern[40] of improper sexual behavior toward students.[41] The District's deliberate indifference was not limited, however, to the maintenance of such a policy—the District was not satisfied with waiting three years to remove certain documents concerning Kearly—on October 27, 1995, after the transfer was approved by Stamatakis, the District purged nearly all past documentation of improper conduct from Kearly's file, including recent letters drafted by Michalowski and Hughes in opposition to the transfer. Furthermore, as noted by Ms. Hughes, Kearly's personnel file was purged by the District despite the fact that there does not appear to be a three-year period in which Kearly was not involved in improper conduct and/or touching.[42] (Hughes Dep. at 204.)

The District's deliberate indifference is also exhibited by the fact that on at least two occasions, the District entered into Letters of Understanding with the WEA for the removal of material from Kearly's personnel file. According to Defendant Stamatakis, the purging of Kearly's official "personnel file" impeded his ability to deal with the concerns raised by Hughes and Michalowski—Stamatakis contends that he may have made a different decision with respect to Kearly's grievance had the official personnel file contained all of Kearly's past misconduct.

---

**39.** This provision was contained in the 1992–1998 Collective Bargaining Agreement. The CBA was retroactive, it was not signed by the parties until two or three years later. (Hughes Dep. at 205.) The District negotiated the CBA and thus could have refused to implement such a provision. (Stamatakis Dep. at 157.)

**40.** It is telling that the Amended Tenure Charges levied against Kearly characterized Kearly as having "engaged in an *ongoing pattern of inappropriate conduct* that has created an offensive learning environment for the students and staff of Warren Consolidated Schools." (Pl.'s Resp. Br. Exh. 2, document 00086) (emphasis added).

**41.** The District's effort to purge Kearly's official personnel file was so effective that, in 1998, when Marsha Pando began to investigate the Plaintiffs' accusations of sexual abuse, Kearly's personnel file contained absolutely no documentation regarding prior accusations of improper conduct. (Pando Dep. at 42.)

**42.** The following colloquy took place at Ms. Hughes' deposition:

Question: I'd like you to tell me, as you go through there, if you can find any three-year period in which Mr. Kearly, according to the district's document, was not involved in some conduct related to improper touching or contact with students.

Answer: There seems to be things almost every year.

Question: Okay. Now, we're limited. We only go from '85 to '94 in that document, correct?

Answer: Correct.

(Hughes Dep. at 204.) Ms. Hughes, in response to Kearly's reprimands, also suggested that the District investigate Kearly's background. Apparently, the District also ignored this request. (Hughes Dep. at 254.)

Taking the facts in a light most favorable to the Plaintiffs, a reasonable jury could conclude that the District maintained a "custom of inaction"—i.e., failing to prevent sexual abuse by teachers after repeated notice of instances which would indicate that the teacher was a pedophile—and that this custom was the "moving force" in the constitutional deprivation.[43] See, e.g., Massey v. Akron City Bd. of Educ., 82 F.Supp.2d 735 (N.D.Ohio 2000); But cf. Claiborne County, supra; Doe v. New Philadelphia Public Schools Bd. of Educ., 996 F.Supp. 741 (N.D.Ohio 1998). The District's motion for summary judgment with respect to Plaintiff's section 1983 claim is denied.

### D. Title IX

Plaintiffs have also asserted a claim pursuant to Title IX, 20 U.S.C. §§ 1681–88. Plaintiffs' complaint alleges that the alleged sexual abuse of Sally, Jane and Mary Doe at the hands of Defendant Kearly amounted to sexual harassment under Title IX's statutory scheme. 20 U.S.C. § 1681 provides, in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Supreme Court has held that "discrimination" under Title IX includes sexual harassment of a student by a teacher. Doe v. Claiborne County, Tennessee, 103 F.3d 495, 513 (6th Cir.1996) (citing Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60, 75, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992)); see also Soper v. Hoben, 195 F.3d 845, 854 (6th Cir.1999).

### 1. Individual Defendants

██ The Government's enforcement power under Title IX may only be exercised against the funding recipient—damages liability has not been extended to parties outside the scope of this power. Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 641, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). As such, summary judgment must be granted in favor of Defendants Stamatakis, Clor and Maiorano with respect to Plaintiff's Title IX claim of sexual harassment. See Soper, 195 F.3d at 854.

### 2. Warren Consolidated School District

██ The District's liability under Title IX depends on the establishment of two elements.[44] First, the plaintiff must establish "actual notice" on behalf of the recipient. Like actions under section 1983, the Supreme Court has held that "it would 'frustrate the purposes' of Title IX to permit a damages recovery against a school district for a teacher's sexual harassment of a student based on principles of respondeat superior or constructive notice, i.e., without actual notice to a school district official." Gebser v. Lago Vista Independent Sch. Dist. 524 U.S. 274, 285, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998). In other words, the recipient must be "[ ]aware of discrimination in its programs." Id. A recipient will be deemed to have actual notice when "an official who at a minimum has authority to address the alleged discrimination" and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately

---

**43.** "If a plaintiff advances sufficient evidence to create a genuine issue of material fact as to the existence of such custom or policy, then the question of 'deliberate indifference' is one for the jury to decide and not for the court at the summary judgment stage." Claiborne County, 103 F.3d at 509 (citing Hicks v. Frey, 992 F.2d 1450, 1456–57 (6th Cir.1993)).

**44.** The District does not argue that it is not a federally funded educational program.

to respond. *Gebser,* 524 U.S. at 290, 118 S.Ct. 1989.

Based on the Court's previous § 1983 analysis above, a reasonable jury could conclude that the District, through those who had authority to address the alleged discrimination and institute corrective measures—Superintendent Stamatakis, Associate Superintendent Beckett, Director Hughes, various principals, etc.— had actual knowledge of a substantial risk of abuse to children in the district based upon numerous complaints lodged against Kearly from 1984 through 1998. *See Hart v. Paint Valley Local Sch. Dist.,* No. 01–004, 2002 WL 31951264, at *5–*7 (S.D.Ohio Nov. 15, 2002) (discussing the contours of the actual notice standard after *Gebser* ).

■ Second, the recipient's response to its actual notice of discrimination must amount to deliberate indifference to discrimination. *Id.* Deliberate indifference occurs when the recipient's response is clearly unreasonable in light of known circumstances. *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 648, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). Similarly, based on the Court's § 1983 analysis *supra,* a reasonable jury could conclude that the District's response amounted to deliberate indifference—i.e., their response to the various allegations were clearly unreasonable. Consequently, the Court DENIES the District's motion for summary judgment as to Count III.

## CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART the motions for summary judgment. Specifically, the Court

(1) GRANTS the Defendants' motions for summary judgment as to Count I;

(2) DENIES the Defendants' motions for summary judgment as to Count II;

(3) GRANTS Defendants Stamatakis, Clor and Maiorano's motion for summary judgment as to Count III; and

(4) DENIES Defendant Warren Consolidated Schools' motion for summary judgment as to Count III.

SO ORDERED.